

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| QUINTON LUCAS, | ) | *Opinion issued April 30, 2024,* |
| | ) | *and modified on the Court's own* |
| Contestant, | ) | *motion June 4, 2024* |
| | ) | |
| v. | ) | No. SC99931 |
| | ) | |
| MISSOURI SECRETARY OF STATE | ) | |
| JOHN R. ASHCROFT AND | ) | |
| MISSOURI STATE AUDITOR | ) | |
| SCOTT FITZPATRICK, | ) | |
| | ) | |
| Contestees. | ) | |

**ORIGINAL PROCEEDING: ELECTION CONTEST**

Quinton Lucas brings an original action in this Court challenging the voters' approval of Amendment No. 4 in the November 2022 general election. Specifically, Lucas claims the fiscal note summary printed on every ballot cast in that election materially misstated the fiscal note for the measure.

This case is not about whether the Kansas City Police Department is adequately funded or, if not, the amount of additional funds that would be needed to do so. Nor is this case about whether the auditor's fiscal note for Amendment No. 4 was sufficient and fair. The former is a matter for Kansas City and the Board of Police Commissioners, not

this Court, and the latter could have been challenged under section 116.190[1] before the election but was not.  Instead, the only issue in this case is whether the auditor's fiscal note summary – the very last thing each and every voter saw before voting "yes" or "no" on Amendment No. 4 – fairly and accurately summarized the auditor's fiscal note as required by section 116.175.3.  This Court concludes it did not and, therefore, orders a new election on this question to be conducted on August 6, 2024.

## BACKGROUND

Kansas City ("City") does not control the budget for the Kansas City Police Department ("Department"). Instead, that budget is overseen by the Board of Police Commissioners ("Board").  The Board is a state agency with five members.  Since 1958, the City has been obligated to provide funds for the Department at whatever amount the Board requests, subject to a maximum set by statute.  *See* § 84.730, RSMo Supp. 1958. Between 1958 and 2022, the City's funding obligation was capped at 20 percent of the City's general revenue, though the City was free to (and, at times, did) provide requested funding in excess of that cap.

A dispute arose in 2021 between the City and the Board regarding the use of funds the City appropriated in excess of the statutory maximum.  In May 2021, the City Council passed two ordinances reallocating funds appropriated above the cap to certain community policing initiatives.  After the City passed these ordinances, the general assembly took up two measures that would change the City's funding obligation to the

---

[1]  All statutory references are to RSMo 2016 unless otherwise noted.

Board.  The first of these measures, Senate Bill No. 678 ("SB 678"), increased the City's statutory maximum funding obligation from 20 percent of the City's general revenue to 25 percent.  Concerned that SB 678 might constitute an unfunded mandate under article X, sections 16 and 21 of the Missouri Constitution, the general assembly also took up Senate Joint Resolution No. 38 ("SJR 38"), which proposed a constitutional amendment exempting certain legislation related to police funding (including SB 678) from article X's prohibition against unfunded mandates.  On May 18, 2022, the general assembly passed both SB 678 and SJR 38.  The proposed constitutional amendment in the latter was put before the voters as Amendment No. 4.

Missouri statutes provide that, when a proposed constitutional amendment is put to the voters, the text of the measure does not appear on the ballot.  Rather, printed on the ballot is a "ballot title" consisting of two parts. § 116.010(4).  The first part of the ballot title is a summary statement of the measure in the form of a question, which is prepared by the secretary of state (or the general assembly may do so when it proposes the constitutional amendment).  §§ 116.010(4), 116.155, 116.160.  The second part is a summary of the fiscal note for the measure.  §§ 116.010(4), 116.170.  Both the fiscal note and the summary of that fiscal note are prepared by the state auditor, though the general assembly may (but is not required to) prepare the fiscal note summary for constitutional amendments it proposes.  §§ 116.155, 116.170.

For Amendment No. 4, the general assembly prepared the summary statement, and the auditor prepared the fiscal note and the fiscal note summary.  The ballot title for Amendment No. 4, in its entirety, read:

3

Shall the Missouri Constitution be amended to authorize laws, passed before December 31, 2025, that increase minimum funding[2] for a police force established by a state board of police commissioners to ensure such police force has additional resources to serve its communities?

State and local governmental entities estimate no additional costs or savings related to this proposal.

On November 8, 2022, Missouri voters approved Amendment No. 4. Lucas timely brought an election contest in this Court seeking a new election under sections 115.555 and 115.593.

**ANALYSIS**

The only issue in this case is whether the fiscal note summary for Amendment No. 4 so materially misstated the fiscal note and misled the voters about the fiscal note's contents that it constituted an irregularity of sufficient magnitude to cast doubt on the fairness of the election and the validity of the results.[3] The Court concludes it did. A new election is the only remedy authorized by statute for such circumstances. § 115.593. Accordingly, the Court orders that remedy.

**I.      This Court Has Original Jurisdiction in This Election Contest**

---

[2]   The general assembly refers to the cap on the City's obligation to provide requested funds to the Department as "minimum funding," but the parties have referred to it as the "maximum funding obligation." Both phrases refer to the 20 percent cap that was raised to 25 percent in SB 678. For convenience, the Court follows the latter convention.

[3] Nothing in this opinion, including the new fiscal note summary specified herein, shall be taken as expressing any opinion as to the enforceability of SB 678, either in the event the voters approve Amendment No. 4 in the August 2024 election or in the event the voters reject it.

Lucas contends this Court has original jurisdiction to hear election contests involving a proposed constitutional amendment and, therefore, filed his petition in this Court in the first instance. The secretary of state and the auditor[4] (collectively, the "state") concede this Court has jurisdiction, citing section article VII, section 5 of the Missouri Constitution, which states the "general assembly shall designate by general law the court or judge by whom the several classes of election contests shall be tried[,]" and section 115.555, which designates this Court to hear contests involving proposed constitutional amendments.[5]

That the parties considered this a settled question is not surprising. This Court held it had original jurisdiction over such matters in *Dotson v. Kander*, 464 S.W.3d 190, 193 n.2 (Mo. banc 2015) ("This Court has jurisdiction to hear this [chapter 115 election contest] pursuant to Mo. Const. art. VII, sec. 5 and section 115.555."), and *Shoemyer v. Missouri Secretary of State*, 464 S.W.3d 171, 172 n.1 (Mo. banc 2015) (citing *Dotson* and *Gantt v. Brown*, 149 S.W. 644, 646 (Mo. banc 1912)). As discussed below, these cases were correctly decided. Even if they were not, however, *stare decisis* requires this Court to follow *Dotson* and *Shoemyer* and hold it has original jurisdiction in this case.

---

[4] The actions attributed to the state auditor occurred under a different administration, but the current auditor is substituted automatically by operation of Rule 52.13(d). Moreover, it appears the auditor was never a proper party. Section 115.553.2 provides the proper contestee is the "officer or election authority responsible for issuing the statement setting forth the result of the election" being challenged. Here, that officer is the secretary of state.

[5] Section 115.555 provides "all contests to the results of elections on constitutional amendments … shall be heard and determined by the supreme court."

## A. *Stare Decisis* Requires This Court to Follow *Dotson* and *Shoemyer*

Our common law system has developed on the assumption legal precedents must be followed. *See* William Blackstone, *Commentaries on the Laws of England*, *Book the First* 69 (Lewis ed. 1900); Randy J. Kozel, *Stare Decisis as Authority and Aspiration*, 96 Notre Dame L. Rev. 1971, 1978-81 (2021) (discussing the historical recognition of *stare decisis* as a legal principle). This principle, the doctrine of *stare decisis*, ensures similar cases are treated similarly in accordance with basic principles of justice. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1989) ("[I]t is indisputable that *stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'" (quoting *The Federalist* No. 78, (Alexander Hamilton))), *superseded on other grounds by* 42 U.S.C. § 1981. *Stare decisis* "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals[.]" *Vasquez v. Hillery*, 474 U.S. 254, 265 (1986). Thus, "[m]ere disagreement by the current Court … is not a satisfactory basis for violating the doctrine of stare decisis[.]" *Crabtree v. Bugby*, 967 S.W.2d 66, 71-72 (Mo. banc 1998), *overruled on other grounds by Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371 (Mo. banc 2014). In this way, *stare decisis* "promotes security in the law," *Templemire*, 433 S.W.3d at 379 (internal quotation omitted), and "contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Vasquez*, 474 U.S. at 265-66.

Of course, judicial precedent is not absolute. While precedent must be followed to prevent the arbitrary interpretation and application of the law, departure from precedent is warranted when the application of prior decisions would be "evidently contrary to reason" or "flatly absurd or unjust." *Blackstone*, supra, at 70. This Court has also indicated departure from precedent is warranted when it results in "recurring injustice or absurd results," *Crabtree*, 967 S.W.2d at 71-72; the precedent is demonstrated unreasonable or incorrect through the passage of time and experience, *Medicine Shoppe Int'l, Inc. v. Dir. of Revenue*, 156 S.W.3d 333, 334-35 (Mo. banc 2005); or it is "clearly erroneous and manifestly wrong." *Templemire*, 433 S.W.3d at 379. None of these exceptions applies to *Dotson* and *Shoemyer*.

This is the first election contest since these cases were decided, so it cannot be suggested their holdings have resulted in recurring injustice or have been shown to be unreasonable or incorrect through the passage of time and experience. Whether one agrees with the basis for *Dotson* and *Shoemyer* set forth below, it cannot be argued the holdings in those cases are evidently contrary to reason, flatly absurd or unjust, or clearly erroneous and manifestly wrong.

Accordingly, the enduring rationales and principles underlying the doctrine of *stare decisis* require this Court adhere to the holding in *Dotson* and *Shoemyer*. "The doctrine of stare decisis promotes security in the law[,]" *Templemire*, 433 S.W.3d at 379 (internal quotation omitted), and reliance on the law as interpreted by the courts is a key factor in the *stare decisis* analysis. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1405 (2020)

7

("[W]hen it revisits a precedent [the United States Supreme] Court has traditionally considered … reliance on the decision." (internal quotation omitted)).

Lucas brought his election contest in this Court as section 115.555 expressly requires and as this Court's decisions in *Dotson* and *Shoemyer* hold he must. Foreclosing his claims now, in spite of this justified reliance, would result in an injustice because it would leave him unable to bring these claims in any court of law.[6] Fundamental considerations of justice and fairness necessitate following the holdings in *Dotson* and *Shoemyer* to avoid such an injustice.

### B. *Dotson* and *Shoemyer* Were Correctly Decided

The doctrine of *stare decisis* aside, *Dotson* and *Shoemyer* should be followed because they were correctly decided. *See Jefferson Cnty. 9-1-1 Dispatch v. Plaggenberg*, 645 S.W.3d 473, 475 (Mo. banc 2022) (holding this Court has an obligation to ensure its own jurisdiction). But, because the analysis in *Dotson* and *Shoemyer* was somewhat conclusory, a fuller discussion of this issue is warranted.

Article V of the Missouri Constitution addresses this Court's jurisdiction to hear and decide cases and, generally, gives this Court only appellate jurisdiction with limited original jurisdiction to hear certain petitions for remedial writs. Mo. Const. art. V, §§ 3, 4. Other constitutional provisions, however, can give this Court original

---

[6] The only provision in the election contest statutes allowing for the results of elections on constitutional amendments to be challenged is section 115.555, which provides for such contests to be brought in this Court. If that statute is unconstitutional, there is no other statute giving any other court jurisdiction to hear this matter; therefore, there would be no appropriate court for Lucas or any future contestants to bring such claims.

8

jurisdiction over specific matters or give the general assembly authority to decide which courts will have original jurisdiction over other matters. Article VII, section 5 does both:

> **Section 5. Election contests – executive state officers – *other election contests*.** Contested elections for governor, lieutenant governor and other executive state officers shall be had before the supreme court in the manner provided by law, and the court may appoint one or more commissioners to hear the testimony. The trial and determination of contested elections of all other public officers in the state, shall be by courts of law, or by one or more of the judges thereof. ***The general assembly shall designate by general law the court or judge by whom the several classes of election contests shall be tried and regulate the manner of trial and all matters incident thereto***; but no law assigning jurisdiction or regulating its exercise shall apply to the contest of any election held before the law takes effect.

Mo. Const. art. VII, § 5 (emphasis added). The language of section 5 is clear, and it unambiguously authorizes the general assembly to "designate" this Court as the proper one for contests involving proposed constitutional amendments and other ballot propositions. The general assembly exercised that authority in section 115.555.

The first sentence in section 5 gives this Court original jurisdiction over election contests involving statewide executive branch officers. The second sentence provides that election contests involving "all other public officers in the state" shall be heard by "courts of law." Together, the first and second sentences pertain to the entire field of election contests involving public officers in the state and divide them into two classes, i.e., those over which this Court will have original jurisdiction and those that will be heard by "courts of law," which may be – but need not be – this Court.

The third and final sentence authorizes the general assembly to "designate by general law the court or judge by whom the several classes of election contests shall be tried[.]" This last phrase contains no restrictions and, therefore, must be read to

9

encompass all classes of election contests, including election contests involving proposed constitutional amendments. If the phrase "the several classes of election contests" meant only election contests involving public officers in the state, the third sentence would be largely duplicative of the first two sentences that specifically address election contests involving state officers. The drafters of this section simply could have added legislative authority to designate the appropriate "court of law" onto the end of the second sentence or started the third sentence by referencing "those" or "such" election contests, referring to the second sentence. Instead, by using the all-inclusive phrase "the several classes of election contests," the drafters authorized the legislature to designate the appropriate court for every type of election contest other than those already committed to this Court in the first sentence.[7]

The use of the all-inclusive phrase "the several classes of election contests" is not new. It also appeared in article VIII, section 9, of the Missouri Constitution of 1875, which is the predecessor to the current provision in article VII, section 5. The 1875

---

[7] Indeed, as noted in section I.A of this opinion, any failure to give the phrase "the several classes of election contests" such an all-inclusive meaning would produce an absurd – not to mention grossly unjust – result in this case and all such cases in the future. If this phrase does not include contests involving proposed constitutional amendments, then it stands to reason the general assembly lacks authority to designate any court to hear them. Article VII, section 5 is the only provision authorizing the general assembly to designate courts to hear election contests and, if contests involving proposed constitutional amendments and other ballot propositions are not included in the third sentence of that section, they are not included anywhere. Lucas (and all future contestants) could not bring such election contests in this Court – or any other – and the general assembly would be powerless to designate some other court to hear and determine such claims in the future. The construction explained herein and adopted in *Dotson* and *Shoemyer* avoids this absurd result.

10

provision stated the "General Assembly shall, by general law, designate the court or judge by whom the several classes of election contests shall be tried[.]" The phrase "the several classes of election contests" meant then – just as it means today – every type of election contest. The meaning of the phrase has not changed. Instead, the only change has been in the number and types of election contests to which it refers.

When the 1875 constitution was adopted, there were no election contests involving proposed constitutional amendments or other statewide ballot propositions because such elections did not appear on Missouri's electoral landscape until 1908. In 1917, plainly perceiving the all-inclusive language in article VIII, section 9 of the Missouri Constitution of 1875 gave it the authority to do so, the general assembly designated this Court as the court with original jurisdiction to hear and determine election contests involving proposed constitutional amendments. 1917 Laws of Mo. 274. And, having already reached that conclusion, it comes as no surprise that, when the current article VII, section 5 was being drafted as part of the new constitution in 1945, the drafters saw no reason to change the phrase "several classes of election contests" to include election contests involving constitutional amendments. No change was needed because that all-inclusive phrase already included such election contests. Again, this is not because the meaning of the phrase had changed, but because that phrase was always meant – and still means – to include every type of election contest other than those expressly committed to this Court's jurisdiction in the first sentence of article VII, section 5.[8]

---

[8] For a similar example, one need look no further than article I, section 8 of the United States Constitution. There, Congress is authorized to regulate commerce "among the

11

For more than a century, no one has questioned that article VII, section 5 of the Missouri Constitution and its predecessor authorize the general assembly to designate which courts should hear every type of election contest not expressly committed to this Court in the constitution itself. This Court in *Dotson* and *Shoemyer* expressly held that section 115.555, designating this Court to hear election contests involving proposed constitutional amendments, is a valid exercise of the general assembly's constitutional authority to do so.

Though not strictly binding, this Court's decision in *State ex rel. Rainwater v. Ross*, 149 S.W. 451 (Mo. banc 1912), makes it clear the Court has never understood the phrase "several classes of election contests" to mean only election contests arising out of the election of public officers. There, the general assembly enacted a "local option" law and, in that statute, set forth the appropriate court to hear contests from such elections. *Id.* at 452. This Court held the scheme enacted by the general assembly was proper and the sole means for contesting these elections. *Id.* at 453. If article VII, section 5 (and the

---

several states[.]" It would be absurd to contend Congress cannot regulate commerce between Kansas and Missouri today because the meaning of the phrase "the several states" is forever restricted to the original 13 states that made up "the several states" when the Constitution was ratified. Instead, when this phrase is applied today, it includes Missouri and Kansas, not because the meaning of the phrase has changed since ratification but because the phrase "the several states" – like the phrase "the several classes of election contests" – always meant to refer to each and every member of an indefinite class whose membership may increase or decrease over time. *See Several, Webster's Third New International Dictionary* (2002) (defining "several" to mean "being a separate member of a group, class, or series[;] individually different within a type[;] … more than one[;] … consisting of an indefinite number more than two and fewer than many usu. of the same class or group").

12

substantially identical provision in article VIII, section 9 of the 1875 Constitution in effect for *Rainwater*) was limited to contests involving the election of state officers, the general assembly would not have had authority to designate the appropriate court to hear "local option" election contests because they did not involve the election of public officers.[9] Instead, this Court in *Rainwater* refused to adopt such a restrictive construction of the phrase "the several classes of election contests," just as it did in *Dotson* and *Shoemyer*, and this Court reaffirms those holdings today.

## II. The State Is Not Entitled to Re-Argue Its Motion to Dismiss

Lucas filed his petition on January 6, 2023, within the time period prescribed by section 115.557. On January 24, rather than filing an answer, the state filed a motion to dismiss on the following grounds: that (1) Lucas' contest is time-barred because his initial petition was not verified and his verified petition was filed after the time for filing under section 115.557 had expired; (2) the City lacked standing as a voter and it was the City, rather than Lucas, who was "the real party in interest" in this suit; and (3) sections

---

[9] In fact, only one member of this Court argued the relevant provision of the 1875 Constitution "only speaks of contests for office, and not of contests of elections upon public questions." *See Rainwater*, 149 S.W. at 454 (Graves, J., dissenting). But Judge Graves' argument failed to persuade a majority of this Court then, it did not persuade any member of this Court in *Dotson* or *Shoemyer*, and it does not carry the day now. In fact, Judge Graves went on to write the Court's opinion in *Gantt*, which steers well clear of construing the phrase "the several classes of election contests" to be limited to only elections of public officers. *See Gantt,* 149 S.W. at 645 (holding "there is in this section the general grant of power to this and other courts of law to try such cases, and, if in the mind of the General Assembly it was thought best to assign ***any class of election contest cases*** to this court, the power to hear and determine would have constitutional sanction" (emphasis added)).

13

115.593 and 115.595, which provide the remedies if an election contest succeeds, are unconstitutional because they result in a method for amending the constitution that is not sanctioned in article XII. This Court ordered Lucas to file suggestions in response to the state's motion, and then permitted the state to file suggestions in reply. On February 9, the matter having been fully briefed, this Court issued an order overruling the state's motion.

When a party before this Court makes a substantive motion prior to the argument and submission of the case, this Court may grant the relief sought, deny that relief, or order the motion taken with the case. In the latter instance, the parties are free to brief and argue the motion along with the merits of the matter before the Court. But, when the Court has sustained or overruled the motion prior to briefing and argument, that resolves the matters raised unless and until the Court gives notice it will reconsider the prior decision, either *sua sponte* or on a party's motion showing the Court misapprehended the law or the facts. *Cf. State ex rel. Schweitzer v. Greene*, 438 S.W.2d 229, 232 (Mo. banc 1969) (noting the circuit court retains discretion to correct, modify or set aside orders until a final judgment is entered, provided "such action should be taken only after proper notice to the parties"); Rule 75.01 (providing a circuit court retains control over its judgments for 30 days "and may, after giving the parties an opportunity to be heard and for good cause," vacate, correct, or amend its judgment).

The obvious rationale for such a rule is to prevent wasting the parties' and the Court's resources re-arguing matters the Court has already decided. In addition, it prevents potential unfair prejudice to the party who, having prevailed with respect to the

14

motion, relies on the Court's decision and does not respond continually to the other party's re-argument. Finally, it leaves the door open for the Court to revisit pre-argument rulings when reconsideration is warranted by giving the parties notice that the matter is again under review.

Here, the Court overruled the state's motion, the state did not seek reconsideration, and the Court has not given notice the matter is again under review. Accordingly, the state's efforts to resurrect the arguments from its motion to dismiss in its briefs and during argument were improper. Moreover, as the Court ordered on February 9, 2023, and as explained below,[10] those arguments lack merit.

### A. Lucas' Amended Petition Relates Back to His Original Filing

Lucas timely filed his election contest petition in this Court. That petition was not verified, as section 115.557 requires it to be. Two days after the state noted this defect in its motion to dismiss, Lucas filed an amended petition with a proper verification. Even assuming it took an amended petition to provide the missing verification,[11] this Court

---

[10] The first and second grounds raised in the state's motion to dismiss are addressed in sections II.A and II.B. The third argument, claiming chapter 115 somehow results in unconstitutional amendments to the constitution, is addressed in section III.A of this opinion below.

[11] Though a party may supply a missing verification via amendment, it is not self-evident this is the only way to do so. Prior versions of Rule 29.15 required an inmate to sign a post-conviction motion and verify it contained all grounds known for challenging the conviction. Nevertheless, this Court held a missing signature could be supplied under Rule 55.03(a) – without amendment – whenever the defect was discovered, even on appeal. *Glover v. State*, 225 S.W.3d 425, 428 n.3 (Mo. banc 2007). This Court reasoned the signature was required by the rule but, as long as the defect was cured promptly once it was discovered, no purpose was served by dismissing the case, particularly because the movant was bound to the representations in Rule 55.03(c) and

15

decided substantially the same issue nearly 40 years ago and held, for purposes of applying the same statute of limitation in section 115.557, "Rule 55.33(c) governs the issue of whether appellant's First Amended Petition relates back to the date of the filing of the original petition." *Beatty v. Metro. St. Louis Sewer Dist.*, 700 S.W.2d 831, 836 (Mo. banc 1985). *Beatty* has never been overruled, it is correctly decided, and the Court will follow it here.

In *Beatty*, the Court held the amendment did not relate back under Rule 55.33(c) because the amendment brought in new contestees who were not in privity with the previously named contestees and who had no actual knowledge of the contest. *Id.* at 837 ("Count I of appellant's First Amended Petition does not relate back to the date of the filing of the original petition. Count I is, therefore, barred by the statute of limitations for election contests. § 115.577."). Lucas' amendment added no new parties and no new claims. Nothing in Rule 55.33(c), or elsewhere in Rule 55.33, prohibits such an amendment from relating back for purposes of the application of a statute of limitations.[12]

---

subject to the sanctions in Rule 55.03(d). *Id.* at 428 The same is true here. There is no indication in the constitution or chapter 115 that a failure to include a verification on an otherwise timely petition deprives this Court of jurisdiction when the defect was promptly cured when noted by the other party and there is no prejudice to that party in the interim.

[12] The state argues at length the election contest statutes are a "code unto themselves," and none of this Court's rules of civil procedure apply unless they are expressly referenced in chapter 115. The state's allegiance to this argument, however, curiously waxes and wanes to suit its purposes. Indeed, the first six words of the state's motion are: "Pursuant to Supreme Court Rule 55.27 …." Chapter 115 nowhere references motions to dismiss, let alone Rule 55.27 and, under the state's logic, the rule cannot be used. The same can be said about the state's invoking Rules 55.03 and 84.06 in the certificate of compliance appended to its brief, not to mention the state electronically

16

Whether the amendment is viewed merely as curing a defect under Rule 55.03(a), or an amendment under Rule 55.33, Lucas' later verification does not render his election contest petition untimely. *Cf. Drury Displays, Inc. v. Bd. of Adjustment of City of St. Louis*, 760 S.W.2d 112, 114 (Mo. banc 1988) ("By framing the question in terms of whether verification is 'jurisdictional,' [respondents] have misconstrued or overlooked the essential issue to be determined, which is, whether the filing of an unverified petition is sufficient to permit a relation back upon filing a properly verified petition or amendment to the original. We hold that it is."); *Standard of Beaverdale, Inc. v. Hemphill*, 746 S.W.2d 662, 664 (Mo. App. 1988) ("The timing of the verification is unimportant as long as the petition is verified prior to the entry of the final judgment. …

---

filed its briefs and all other papers pursuant to Rule 103. None of these rules is mentioned in chapter 115. In *Foster v. Evert*, 751 S.W.2d 42,44 (Mo. banc 1988), this Court noted chapter 115 provides certain procedures and, when it does, conflicting procedures found in the ordinary rules of civil procedure do not apply.

> This Court has said that election contest statutes are a code unto themselves. The ***procedures there established are exclusive*** and must be strictly followed as substantive law. From this conclusion it also follows that technical requirements which relate to the service of summons in ordinary civil actions do not apply ***when election contest statutes provide a contrary procedure***.

*Id*. (emphasis added) (internal citations and quotations omitted). As this quote shows, however, *Foster* does ***not*** hold ordinary rules of civil procedure cannot be used regarding matters about which chapter 115 is silent. In fact, immediately before the quote from *Foster* set out above, this Court cited to *Beatty* with approval even though *Beatty* held Rule 55.33 applies in election contests. *Id*. Plainly, *Foster* – and the Court in this present case – agree with the conclusion in *Moore v. Morehead*, 666 S.W.2d 460, 461 (Mo. App. 1984), stating: "To the extent that the statutes governing election contests are silent as to the procedural rules to apply in the conduct of such contests, the relevant procedural statutes and rules that apply in all civil actions also apply in governing procedure in election contests."

17

The verification requirement is not so strict as to make the initial, unverified petition unsalvageable, and the verification relates back to the filing of the original petition.").

## B.    Lucas Has Standing to Bring This Election Contest

The state also argues Lucas does not have standing to challenge the election approving Amendment No. 4 because he is the City's mayor. This argument is rejected because section 115.553 controls who may bring such challenges. It provides:

> The result of any election on any question may be contested by ***one or more registered voters from the area in which the election was held***. The petitioning voter or voters shall be considered the contestant and the officer or election authority responsible for issuing the statement setting forth the result of the election shall be considered the contestee. In any such contest, the proponents and opponents of the ballot question shall have the right to engage counsel to represent and act for them in all matters involved in and pertaining to the contest.

§ 115.553.2 (emphasis added).

Lucas pleaded and proved he is a registered Missouri voter. The state does not contest this fact. That ends the analysis under section 115.553, which entitles Lucas to bring this action.[13]

Nothing in section 115.553 excludes elected officials from bringing an election contest in their individual capacity as voters. *Cf. State ex rel. Fitz-James v. Bailey*, 670

---

[13]    The state argues the City – not Lucas – is the real party in interest because the City is directing the litigation and paying for Lucas' representation using both the city counselor's office and private counsel. Even if these facts are true, the state fails to cite any authority for its contention that they deprive Lucas of his statutory right to bring the action as a voter. If there are concerns about the City paying the costs of an action brought in Lucas' individual capacity, a matter on which the Court expresses no opinion, such concerns do not alter the fact that Lucas pleaded and proved he is a registered Missouri voter and, as such, is entitled to bring this suit under section 115.553.2.

S.W.3d 1, 9 n.6 (Mo. banc 2023) ("[T]he Attorney General cannot bring such a [chapter 116 ballot title] challenge in his official capacity, but nothing prevents him from doing so in his individual capacity."). It is sufficiently clear Lucas brought this action in his individual capacity. *See* Amended Petition at ¶ 3 ("Plaintiff Quinton Lucas is a registered voter of the state of Missouri in the City. He has standing to bring this suit."). The amended petition draws a clear distinction between Lucas as contestant, on the one hand, and the City on the other. Such a carefully drawn line would be unnecessary if the action was brought in Lucas' official capacity. *See Gas Serv. Co. v. Morris*, 353 S.W.2d 645, 648 (Mo. 1962) ("[I]n so far as the petition attempts to state an action against the named defendants in their respective official capacities, the action is one against the State of Missouri."). Because the Court cannot ignore the pleadings and the evidence, the state's argument must fail. *Compare City of Crestwood v. Affton Fire Prot. Dist.*, 620 S.W.3d 618, 629 n.8 (Mo. banc 2021) (holding the city lacked standing to bring a challenge under the Hancock Amendment, which permits challenges only by taxpayers), with *State ex rel. City of Desloge v. St. Francois Cnty.*, 245 S.W.3d 855, 861 (Mo. App. 2007) (holding county officials could bring a challenge under the Hancock Amendment because the officials alleged they were taxpayers).

III. **Inaccurate and Misleading Ballot Title Language Can Be the Basis for an Election Contest**

Chapter 115 allows a registered voter to contest "[t]he result of *any* election on *any* question" after an election has been held. § 115.553.2 (emphasis added). And, as noted above, chapter 115 provides "all contests to the results of elections on

19

constitutional amendments … shall be heard and determined by the supreme court."
§ 115.555. Finally, "[i]f the court … determines there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election, it may order a new election … on the contested question." § 115.593.

The state contends defects in a ballot title (either in the summary description of a proposed constitutional amendment or in the fiscal note summary for that proposal) cannot form the basis for an election contest under section 115.553.2 and – no matter how inaccurate or misleading it may be – the ballot language cannot constitute an "irregularity" sufficient to justify a new election under section 115.593. Instead, the state contends the sole and exclusive means for challenging the language of a ballot title is a pre-election action under section 116.190, which provides a citizen may challenge the ballot title or the fiscal note for a proposed constitutional amendment by bringing an action within 10 days of the ballot title being certified.

In support of this contention, the state raises three arguments. First, the state argues – if this Court were to set aside the election regarding Amendment No. 4 and order a new election – such action would in effect be an illegal amendment to the constitution because Amendment No. 4 went into effect December 8, 2022, and cannot be removed thereafter except as provided in article XII. Second, the state contends – under section 116.020 – the provisions of chapter 116 concerning pre-election ballot title challenges must take precedence over the general provisions of chapter 115, including the provisions regarding election contests. Third, the state argues election contests under

section 115.555 may challenge only misconduct occurring on election day itself, i.e., in the casting and counting of ballots, not the language of the ballots themselves.

All of the state's arguments, and more, were addressed and rejected in *Dotson*, 464 S.W.3d at 193-95, and *Shoemyer*, 464 S.W.3d at 173-74, both of which held inaccurate or misleading language in a ballot title could form the basis for a post-election contest under section 115.555 so long as the issue had not previously been litigated and determined. *Dotson*, 464 S.W.3d at 195; *Shoemyer*, 464 S.W.3d at 173.[14] The state fails to explain why these holdings should not apply here to permit Lucas' claims.

A.    **Election Contests Are Not Unconstitutional Amendments to the Constitution**

The state's first argument (i.e., that an election contest based on the language in the ballot title cannot proceed because the constitutional amendment became effective 30 days after the election) was specifically rejected in *Shoemyer*, 464 S.W.3d at 173-74. The state's effort to resurrect this argument now by couching such an election contest as an illegal amendment to the constitution fares no better. The state's argument simply proves too much.   All election contests on whatever basis can be brought up to 30 days after the secretary of state announces the election's results. § 115.557. That announcement necessarily occurs weeks after the election itself. § 115.511.3. As such,

---

[14]   Though the question was not resolved until *Dotson* and *Shoemyer*, this Court strongly foreshadowed this result in Dotson's ill-fated pre-election challenge. *See Dotson v. Kander*, 435 S.W.3d 643, 645 (Mo. banc 2014) (dismissing a pre-election challenge to ballot title language as moot, but noting "judicial review of a claim that a given ballot title was unfair or insufficient … is available in the context of an election contest should the proposal be adopted").

21

few (if any) election contests could be completed before the 30th day after the election approving the proposed amendment, when article XII, section 2(b) provides the amendment becomes effective. If the state's illegal amendment argument was correct, it would bar practically all election contests no matter what types of irregularities were alleged. Section 115.595 expressly avoids such an absurd result by explaining how to proceed when an election concerning a proposed constitutional amendment is challenged. *See* § 115.595.2 (stating a proposed amendment is deemed approved or disapproved as shown in the returns of the election until the contest is decided, at which time it is deemed approved or disapproved in accordance with the decision). As it did in *Shoemyer*, the Court again rejects the argument that article XII implicitly prevents the very election contests article VII and chapter 115 explicitly authorize.

B.      **Election Contests Based on the Ballot Title Are Not Barred Simply Because a Pre-Election Challenge Is Possible**

The state's second argument (i.e., that a pre-election action under section 116.190 is the exclusive means of challenging the language of a ballot title because, under section 116.020, this section takes precedence over the provisions of chapter 115) was also rejected by this Court. *Dotson,* 464 S.W.3d at 194 (holding, even though "chapter 116 provides a pre-election challenge to a ballot title, there is no statutory indication that it is the only vehicle for such a challenge"). In fact, section 116.190 provides only that a citizen "may" bring a pre-election ballot title challenge, not that all such challenges "shall" be brought under that section. And section 116.020, on which the state so heavily relies, provides the "procedures contained in chapter 115 ***shall apply*** to elections on

22

statewide ballot measures, except to the extent that the provisions of chapter 116 directly

conflict, in which case chapter 116 shall prevail[.]" (Emphasis added). Nothing in

section 116.190 (or any other provision in chapter 116) "directly conflicts" with the broad

language of section 115.553 stating the "result of any election on any question may be

contested" or the provisions in sections 115.557, *et seq.*, outlining the procedure for such

challenges. Accordingly, section 116.020 does not prohibit a post-election contest under

chapter 115 based on the language of the ballot title, and a pre-election action under

section 116.190 is not the sole and exclusive method for such a challenge.[15] *See Dotson*,

464 S.W.3d at 194 (holding, because section 116.120 states the election procedures in

chapter 115 apply to elections on statewide ballot measures, "a challenge to the ballot

title of a proposed constitutional amendment may be brought in a post-election action

under chapter 115, so long as the issue has not been previously litigated and

determined").

---

[15] The state argues amendments to section 116.190.5 after *Dotson* and *Shoemyer* are sufficient either to show legislative disapproval of those two decisions or, at a minimum, a sufficient basis for this Court to hold those decisions are no longer binding. The state makes too much soup from a single oyster. The changes are found in the first sentence of section 116.190.5, which states: "Any action brought under this section that is not fully and finally adjudicated within one hundred eighty days of filing, and more than fifty-six days prior to the election in which the measure is to appear, including all appeals, shall be extinguished …." The state infers from this sentence that post-election contests to ballot language cannot be entertained. As this sentence plainly states, however, the time limits therein apply only to "[a]ny action brought under this section." Therefore, by their own terms, the amendments to section 116.190.5 say nothing about actions brought under section 115.555, *et seq.*, and have no effect on the validity and binding precedential nature of *Dotson* and *Shoemyer*.

23

## C.     "Irregularities" Are Not Limited to Election Day Conduct

The state's third argument (i.e., that materially inaccurate and misleading ballot language cannot constitute an "irregularity" sufficient to raise an election contest under section 115.593 because election contests apply only to election day conduct) was thoroughly analyzed and rejected in *Dotson*.  This Court noted "'[i]rregularity' is not defined in chapter 115, but courts have considered the violation of election statutes an irregularity that may be addressed in an election contest."  *Dotson*, 464 S.W.3d at 194 (citing *Gerrard v. Bd of Election Comm'rs*, 913 S.W.2d 88, 89 (Mo. App. 1995)).

This argument merely repackages the argument that, if a pre-election remedy exists, it necessarily forecloses a post-election contest under chapter 115.  In *Dotson*, this Court held statutory violations that might have been challenged prior to the election may still be raised in a post-election contest.  *Id.* (citing *Marre*, 775 S.W.2d 951).  *Marre*, which permitted an election contest to challenge voter qualifications even though a pre-election challenge was available, was such a case.  *Marre*, 775 S.W.2d at 953.[16]  This holding also disposes of the argument that election contests are limited to challenging election-day conduct.

---

[16]    *Dotson* cites two other cases for the same proposition.  *Dotson*, 464 S.W.3d at 195 (citing *United Gamefowl Breeders Ass'n of Mo. v. Nixon,* 19 S.W.3d 137, 139 (Mo. banc 2000) (rejecting the argument that pre-election review under chapter 116 is the exclusive way to challenge the constitutional form of an initiative measure); *Beatty,* 700 S.W.2d at 838 ("The wording of the proposition on a ballot and the propriety of the notice of election provided [in a special sewer district election] are issues cognizable only in an election contest.")).

24

As with the prior two arguments, the state's third argument seeking to avoid the application of *Dotson* and *Shoemyer* adds little that was not argued in those cases and nothing sufficiently compelling enough to justify departing from the principles of *stare decisis* discussed at length in section I.A of this opinion. Accordingly, the state's arguments are rejected, and this Court holds Lucas' claim with respect to the language of the ballot title for Amendment No. 4, which has not previously been litigated and determined, is cognizable in this election contest under section 115.555, *et seq.*

IV.     **Amendment No. 4's Ballot Title Was Inaccurate and Misleading**

Lucas' election contest raises one claim, i.e., the fiscal note summary at the end of the Amendment No. 4 ballot title was insufficient and unfair and constitutes an irregularity sufficient to cast doubt on the fairness of the election and the results it produced. The Court agrees. This Court is not holding the fiscal note is an unfair or insufficient assessment of the fiscal impact of Amendment No. 4, or that the fiscal note summary unfairly or insufficiently reflects the fiscal impact of Amendment No. 4. Neither of these questions is before the Court. Instead, this Court holds only that the fiscal note summary printed on every ballot in the 2022 general election was an inaccurate and misleading summary of the fiscal note itself.

The purpose of a fiscal note is to assess the fiscal impact of a ballot proposition, including any governmental cost or savings. *See* § 116.175.1 ("[T]he auditor shall assess the fiscal impact of the proposed measure[.]"); § 116.175.3 (providing the fiscal note "shall state the measure's estimated cost or savings, if any, to state or local governmental entities"). In fulfilling this duty, the auditor "may consult with the state departments,

25

local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal." § 116.175.1. When the fiscal note is finished, the auditor is then to prepare a brief summary that "adequately and without bias, prejudice, or favoritism synopsize[s] the fiscal note." *Brown v. Carnahan*, 370 S.W.3d 637, 654 (Mo. banc 2012).

To prepare the fiscal note for Amendment No. 4, the auditor contacted various state and local governmental entities to gather information regarding its fiscal impact. The City was one of the governmental entities contacted, and it responded that the Amendment would have a "negative fiscal impact" on the City. When asked for specifics, the City responded that SB 678 – which Amendment No. 4 authorizes to become effective notwithstanding article X's prohibition of unfunded mandates – would increase the City's maximum funding obligation from 20 percent of its general revenue to 25 percent, that the City expected the Board's demand to reach the 25 percent level every year, and that the impact of increasing the City's maximum funding obligation from 20 percent to 25 percent was estimated to be $38,743,646 per year.

Based on the responses received, the auditor prepared a fiscal note describing the potential fiscal impact of Amendment No. 4. Because the City is the only political subdivision directly impacted by Amendment No. 4 (and SB 678 which it authorizes),[17]

---

[17] None of the other political subdivisions surveyed specified any fiscal impact from Amendment No. 4 and, from among the nearly two dozen state agencies and departments, the only estimated costs came from the secretary of state (costs related to putting Amendment No. 4 before the voters) and the attorney general (unspecified costs related to litigation concerning the enactment of the amendment).

nearly all of the substantive portion of the fiscal note is devoted to the fiscal impact on

the City. With respect to that fiscal impact, the fiscal note states in its entirety:

> Officials from the City of Kansas City indicated if this amendment is approved by the voters it will have a negative fiscal impact on their city because it will provide authorization to the implementation of the state legislature's recently passed SB 678 that increases the amount that Kansas City must fund its police department from 20% to 25% of the City's general revenue. Kansas City expect [sic] the maximum 25% to be reached every year.
>
> The increase for Kansas City in terms of an estimated dollar amount by increasing the amount that Kansas City must fund its police department from 20% to 25% of the city's general revenue is $38,743,646.
>
> This is calculated based on the Fiscal Year 23 Submitted Budget:
>
> > 20% of General Revenue from such budget - $154,974,583
> > 25% of General Revenue from such budget - $193,718,228
> >
> > Difference - $38,743,646
>
> Under current law, the city is allowed to exercise its legislative prerogative to fund the State Board of Police Commissioners at a level in excess of the statutory amount. If SB 678 is signed or otherwise becomes law, and if the amendment is approved, it could obligate the City of Kansas City, Missouri to appropriate an additional 5% of its general revenue in response to a budget prepared by the State Board of Police Commissioners. A change to the percentage would limit the city's budgetary flexibility and necessitate a reduction in other services the city provides of up to 5% of its general revenues. Based on the city's most recent budgeted calculation of general revenue, the resolution could increase the city's mandatory funding for the police and decrease its funding for other services funded by general revenue, including but not limited to, fire protection services, roadway and infrastructure maintenance, and other municipal services by more than $38.7 million.

The fiscal note for Amendment No. 4 also included a response from the

Department and the Board, which stated in its entirety:

> The Kansas City Missouri Police Department is tasked with policing a city with a population of approximately 500,000 and nearly 320 square miles. The Police Department must maintain law enforcement staff that can adequately respond to the needs of the community.

27

In Fiscal Year 2022, the City determined that the Police Department received 24.8% of its general revenue. This was $1.8 million less than appropriated in the Fiscal Year 2020 (pre-COVID), and there has been an increase of $2.35 million in just health insurance since that time. This is just one of many items that increased our budget without additional funding. In addition, in the Fiscal Year 2020, the department was funded at full staffing. Currently, with the department being underfunded, the department will continue to be understaffed if funding is not proportionate to increasing costs.

Currently, the department's general fund is 93.8% personnel costs. If the Police Department funding were to continue at 20%, it would remain less than what the City has been funding, and would not support personnel and the bare minimum in other costs that are necessary to operate the Police Department. The current 20% does not allow the Police Department to police the city properly and is a detriment to the community that we serve.

Notwithstanding the lengthy discussion in the fiscal note concerning the fiscal impact on the City set forth above, the auditor's summary of that fiscal note stated, in its entirety:

State and local government entities estimate no additional costs or savings related to this proposal.

Lucas does not challenge the fiscal note, and with good cause. "This Court has held section 116.175 vests great discretion in the Auditor, both as to what information to solicit as well as whether and to what extent to rely on whatever information is received." *Fitz-James*, 670 S.W.3d at 9 n.6 (citing *Brown*, 370 S.W.3d at 667 (noting the auditor is not required to conduct independent research regarding the fiscal impact of a proposal or "double-check[ ] economic theories and assumptions" included in any submission and "is not required to compel and second-guess reasonable submissions from entities but is able to rely on the responses submitted")). The auditor reasonably sought a response from the

28

City (among many others), sought clarification of the City's response, and solicited additional information from the Department and the Board.

Nothing in the fiscal note indicates the auditor ever questioned, let alone rejected, the information the City supplied. Nothing in the fiscal note indicates the auditor concluded the City's information was too speculative or was not relevant to the fiscal impact should Amendment No. 4 be adopted. Instead, the auditor included all of the information quoted above in the fiscal note for Amendment No. 4 without qualification, limitation, or rebuttal.

The auditor then turned to drafting a summary of the fiscal note. Again, as with preparing the fiscal note itself, the auditor has considerable discretion in deciding how best to summarize a fiscal note given the 50-word limitation (not counting articles) and the statutory imperative to use "language neither argumentative nor likely to create prejudice either for or against the proposed measure." § 116.175.3;[18] *see also* *Fitz-James*, 670 S.W.3d at 9 n.6 (citing *Mo. Mun. League v. Carnahan*, 303 S.W.3d 573, 583 (Mo. App. 2010) (noting "[a]ll of the details of a fiscal note need not be set out in a summary consisting of a mere fifty words" to comply with the requirements of section 116.175)). This is why a "fiscal note summary is not judged on whether it is the 'best' language, only whether it is fair." *Mo. Mun. League*, 303 S.W.3d at 583.

---

[18] Notwithstanding the auditor's discretion in crafting a fair and accurate summary of the fiscal note, section 116.175.3 provides that estimated cost or savings from the proposal, if any, must be included in the fiscal note summary as well as the fiscal note itself. As a result, any estimates the auditor decides to include in the fiscal note also must be echoed in the summary.

29

To say the auditor has discretion in preparing the summary of the fiscal note, however, is not to relieve the auditor of the primary statutory obligation that the fiscal note summary must actually "summarize" the fiscal note. *See* § 116.175.3 ("The fiscal note summary shall contain no more than fifty words, excluding articles, which **shall summarize the fiscal note** in language neither argumentative nor likely to create prejudice either for or against the proposed measure." (emphasis added)). A "summary" that materially misstates what it is supposed to summarize fails in this principal object.

The fiscal note states, "Officials from the City of Kansas City indicated if this amendment is approved by the voters it will have a **negative fiscal impact** on their city[.]" (Emphasis added). The fiscal note explains, if Amendment No. 4 is approved, "it will provide authorization to the implementation of the state legislature's recently passed SB 678 that **increases the amount that Kansas City must fund** its police department from 20% to 25% of the City's general revenue." (Emphasis added). The note then states the "increase for Kansas City in terms of an estimated dollar amount by **increasing the amount that Kansas City must fund its police department from 20% to 25% of the city's general revenue is $38,743,646**." (Emphasis added). Nothing elsewhere in the fiscal note indicates the auditor rejected or even qualified these statements.[19]

Notwithstanding the foregoing excerpts from the fiscal note – uncontradicted there by the auditor or qualified in any respect – the auditor's summary of the fiscal note tells

---

[19] The Department's submission is primarily aimed at explaining why it needs more than 20 percent of the City's general revenue to properly perform its duties, a subject that is not at issue in this case.

the voters only that "[s]tate and local governmental entities estimate no additional costs or savings related to the proposal." That "summary" materially misstates, and materially misrepresents, the fiscal note. A voter reading this summary not only would not understand the portion of the fiscal note describing the fiscal impact on the City, that voter surely would be surprised to discover that a large portion of the fiscal note was devoted to that subject. Whatever one might think about the information the City provided, the auditor chose to include that information (*without* qualification) in the fiscal note. Having done so, it simply cannot be argued the fiscal note summary fairly and accurately summarized that part of the fiscal note. Because the fiscal impact on the City was the most significant issue addressed in the fiscal note, a summary ignoring that impact was not only inaccurate, it was misleading as well.

A.    The Auditor's Discretion Cannot Justify an
       Inaccurate and Misleading Fiscal Note Summary

The state argues, because of the 50-word limit, the auditor has discretion in deciding which fiscal impacts in the fiscal note should be included in the summary and which should be excluded. The 50-word limit may require the auditor to exercise discretion when a fiscal note describes many different types and sizes of fiscal impacts, but the state fails to explain how this limit played any role in the present case in which the auditor used only 15 of the 50 words permitted under section 116.175.3.

The state also argues the auditor has discretion to determine whether a response is reasonable or reliable and does not have to include in the summary any estimate the auditor determines is unreasonable or unreliable. This is incorrect. This Court has said

31

the auditor can pick and choose which parts of which responses are sufficiently reasonable and reliable to be included in the fiscal note. *Fitz-James*, 670 S.W.3d at 9 n.6. But, once information is included in the fiscal note ***without rejection or qualification***, the auditor is bound to craft a summary that "adequately and without bias, prejudice, or favoritism synopsize[s] the fiscal note." *Brown*, 370 S.W.3d at 654.

The state's argument suggests a basic misunderstanding of the relative roles of the fiscal note and fiscal note summary. Its argument suggests: (1) the fiscal note is merely a compilation of the responses received by the auditor that the auditor is powerless to change; but (2) the auditor is free to accept, reject, qualify or change all or any part of the fiscal note when drafting the fiscal note summary. In other words, the state's argument proceeds from an assumption that the fiscal note contains the state and local governmental entities' estimates (and, for initiative proposals, the proponent's and opponent's estimates), but the fiscal note summary is reserved for the auditor's estimate, which the auditor has discretion to formulate without regard for whether the estimates in the summary agree with or depart from the estimates in the fiscal note. This assumption contradicts both common sense and the plain language of the statutes.

Section 116.175.1 plainly states "the auditor shall assess the fiscal impact of the proposed measure." The fiscal note *is* that assessment. The auditor is entitled to solicit information to prepare the fiscal note, § 116.175.1, and this Court has made it clear the auditor has the discretion "both as to what information to solicit as well as whether and to what extent to rely on whatever information is received." *Fitz-James*, 670 S.W.3d at 9 n.6. But that discretion is exercised in drafting the fiscal note.

The fiscal note summary, on the other hand, is just that, i.e., a **summary** of the fiscal note. That is what the general assembly intended, *see* § 116.175.3 (providing the fiscal note summary "shall summarize the fiscal note"), and that is the plain meaning of the word. *See Summary*, *Webster's Third New International Dictionary* (2002) (defining "summary" to mean "constituting or containing a summing up of points[;] covering the main points concisely[;] summarizing very briefly"). So, any argument the auditor is free to draft a fiscal note summary that departs in material respects from the fiscal note itself is simply incorrect.

This is not to say the auditor is bound by the submissions received. Instead, if the auditor is not persuaded by a submission, the auditor can omit it from the fiscal note or, better yet, include both the submission and the auditor's reasons for rejecting it in the fiscal note.[20] In such a case, a summary ignoring the rejected submission, nevertheless, would be a fair and sufficient "summary" of the fiscal note because either the submission was not included in the fiscal note or it was included together with an explanation as to why the auditor decided it was not reliable. The state insists the auditor has discretion to do this sort of reasonableness review, and the Court agrees. The state's argument goes

---

[20] In preparing a fiscal note, the auditor's decisions regarding which submissions to rely on and to what extent can still be challenged in a pre-election action under section 116.190.3 because the fiscal note must, in any event, be a fair and sufficient assessment of the proposal's fiscal impact. On the other hand, a post-election contest of that sort (i.e., when the claim is the ballot title was an "irregularity" even though it contained an accurate summary of the fiscal note because the fiscal note itself was flawed) would present a much more difficult case to make than the present one (i.e., when the claim is the fiscal note summary in the ballot title materially misstated the fiscal note it was supposed to summarize).

33

astray, however, with respect to when and where this discretion is used. It must be used

in drafting the fiscal note because the auditor is obligated to produce a fiscal note that

fairly and sufficiently assesses the fiscal impact of the proposal. It cannot be used later to

decide which material parts of the fiscal note the auditor will ignore or contradict in the

fiscal note summary, because that is neither what a summary is nor what a summary

does.

### B. The Fiscal Impact of Amendment No. 4

Finally, the state argues the auditor was entitled to draft a fiscal note summary

ignoring the portion of the fiscal note regarding the City's estimates because Amendment

No. 4 and SB 678, together,[21] would not impose new costs on the City given that the City

had, in recent years, provided funding to the Department at or near 25 percent of its

---

[21] It could be suggested the City's assessment of Amendment No. 4's fiscal impact actually reflects the fiscal impact of SB 678, not Amendment No. 4, because – in the abstract and by itself – Amendment No. 4 affects only the general assembly's authority and imposes no costs on anyone. The state does not make this argument, and rightly so. It is true that estimating costs or savings relating to a proposed constitutional amendment can be difficult, particularly when the proposal merely expands the general assembly's authority to enact laws. In crafting a fiscal note for such a measure, the auditor cannot engage in pure speculation as to whether or how the general assembly might (or might not) employ the new authority in the future. But no such speculation is needed here. SB 678 was the *raison d'etre* for Amendment No. 4. The new exception to the unfunded mandate prohibition in article X, section 21 created by Amendment No. 4 applies only to the City and is carefully tailored to SB 678. Under these unique circumstances, any fiscal note that ignored SB 678 in assessing the fiscal impact of Amendment No. 4 would be materially inaccurate and misleading. The auditor was correct in taking SB 678 into account in drafting the fiscal note. The error was in ignoring SB 678's impact in drafting the fiscal note summary.

34

general revenue rather than refusing to go above its 20 percent statutory maximum obligation.   The Court disagrees.

The fiscal note includes the City's estimate that Amendment No. 4 and SB 678 impose new costs, and nothing in the fiscal note explains that this estimate is inaccurate or unreliable.  In fact, the general assembly plainly understood SB 678 imposed new costs.  Otherwise, there would have been no need for Amendment No. 4 to propose a new exception to the constitutional prohibition against unfunded mandates.

Article X, section 21.1 of the Missouri Constitution (which is a portion of what is referred to colloquially as the Hancock Amendment) provides:

> [A]n increase in the level of any activity or service beyond that required by existing law shall not be required by the general assembly … of counties or other political subdivisions, unless a state appropriation is made and disbursed to pay the county or other political subdivision for any increased costs.

The sole purpose of Amendment No. 4 was to avoid the foregoing prohibition against unfunded mandates by adding a new exception stating:

> Notwithstanding the foregoing prohibitions, before December 31, 2026, the general assembly may by law increase minimum funding for a police force established by a state board of police commissioners to ensure such police force has additional resources to serve its communities.

If the general assembly did not believe SB 678 imposed new or increased costs on the City, there would have been no need for a new exception to article X, section 21 as proposed in Amendment No. 4.  As a result, SB 678 either imposed such costs (in which

35

case the mandate could not be enforced[22] unless the new exception proposed in Amendment No. 4 was approved) or it did not impose such costs (in which case Amendment No. 4 served no purpose).  The fact the general assembly proposed and sent Amendment No. 4 to the voters shows it understood SB 678 imposed new or additional costs on the City.  The auditor's decision to omit from the fiscal note summary the one fiscal impact making Amendment No. 4 necessary in the first place cannot be justified by insisting Amendment No. 4 was never necessary at all.

Finally, the state argues the impact of Amendment No. 4 was not to the City's costs (which it had paid voluntarily in the past) but to its discretion, i.e., the City's freedom to provide funding above the old 20 percent cap as it saw fit was replaced with an obligation to provide requested funding up to the new 25 percent cap.  The state insists such an impact is not a "cost or savings" and, therefore, does not belong in the fiscal note or the fiscal note summary.[23]  Again, this argument ignores the statutory language.

---

[22]  "Hancock claims are not attacks on the validity of the challenged provision.  Rather, they are an attack on the provision's enforcement."  *City of St. Louis v. State*, 682 S.W.3d 387, 397 n.8 (Mo. banc 2024) (citing *Breitenfeld v. Sch. Dist. of Clayton*, 399 S.W.3d 816, 820 n.3 (Mo. banc 2013) ("Even if an unfunded mandate violating the Hancock Amendment is established, the remedy is not the total invalidation of the statute as unconstitutional but rather the entry of a declaratory judgment that relieves the duty to perform the state-mandated activity or service at issue.")).

[23]  In fact, the auditor's staff justified ignoring the fiscal impact provided by the City on the following ground:  "City officials did not indicate additional costs or savings would be added to the City overall; they indicated increased funding for the police department which would result in decreased funding for other services."  First, section 116.175.1 refers to "costs or savings," not "net costs or savings" or "increased costs or savings overall."  Second, when a new requirement of funding for one service necessarily results in decreases to other services (as surely it must for any governmental entity bound to balance its budget), that is a "fiscal impact" as the phrase is used in section 116.175.1.

36

Section 116.175.1 charges the auditor with responsibility for assessing the proposal's "fiscal impact." Later in that same section, the auditor is told to include in the fiscal note and in the fiscal note summary "cost or savings," if any, from the proposal. If "fiscal impact" was limited to "cost or savings," as the state suggests, the general assembly would not have used both phrases in the same section. Instead, this language plainly indicates "fiscal impact" includes, but is not limited to, "cost or savings." The present case is a good illustration for why the broader phrase was included.

At the risk of oversimplifying, state and local governments estimate future revenues and then decide how that money will be spent. This process accounts for all the anticipated revenue because even a decision to hold money in reserve for the future is (at least in governmental usage) a decision about how to spend that money. But, because neither the state nor any of its political subdivisions is, as a general matter, permitted to spend more than it brings in, every enactment requiring the government to spend a dollar on "X" is also a decision not to spend it on "Y" or "Z." One can characterize that enactment as imposing a "cost" of one dollar (i.e., the cost of "X") or as merely limiting the government's discretion to spend that dollar on "Y" or "Z." Both are accurate and, if the former is part of the "fiscal impact," then the latter must be as well.

Prior to SB 678, the City was free to choose to fund Board requests for the Department above 20 percent, and it could choose to do so some years but not others. Under Amendment No. 4 and SB 678, however, that choice disappears. At the beginning of each budget cycle, the City will have up to $38 million less to spend on the remainder of government than it would have without Amendment No. 4 and SB 678. It does not

matter whether one characterizes Amendment No. 4 and SB 678 as imposing a "cost" of $38 million per year or reducing the City's budgetary control over $38 million each year. The two are functionally the same and both are part of the "fiscal impact" of Amendment No. 4 and SB 678.

## V.    The Inaccurate and Misleading Ballot Title for Amendment No. 4 Was an "Irregularity" of Sufficient Magnitude to Cast Doubt on the Election

As set forth above, the fiscal note summary in this case failed in its principal object to concisely and accurately advise voters of the fiscal impact of the proposal as set forth in the fiscal note. Worse, the fiscal note summary actually misled voters by suggesting Amendment No. 4 would have no fiscal impact when the fiscal note identified a sizeable one. Had this been a pre-election contest under section 116.190, this would end the analysis. The fiscal note summary would be declared unfair and insufficient and the Court would rewrite it.

But more is required when a post-election contest is brought under section 115.557, *et seq*. Following the process set forth in chapter 115,[24] the contestant must plead and prove the points on which the contestant contests the election. § 115.557. For

---

[24]   To challenge an election in this Court under chapter 115, the contestant must file a verified petition in the office of the clerk of the Supreme Court. § 115.557. Lucas timely filed his petition, but failed to verify it. He promptly filed a verified amended petition on February 10, 2023. After the petition and answer were filed, this Court appointed the Honorable S. Cotton Walker, Judge, 19th Judicial Circuit, to act as a commissioner for the purpose of taking evidence as required by section 115.559. Judge Walker filed a report with this Court, including the evidence received and transcripts offered. The Commissioner, however, is not the factfinder. Because this Court has exclusive original jurisdiction, the Court finds the facts in the first instance.

the Court to grant relief in the form of a new election, the contestant has the burden to show "there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election[.]" § 115.593. Showing the fiscal note summary was both materially inaccurate and seriously misleading establishes such an "irregularity," but Lucas must still show this irregularity casts doubts on the entire election sufficient to justify setting aside its results. He has made that showing.

Lucas offered the expert opinion of a public opinion researcher who polled Missourians who voted in the 2022 general election and tested the impact different fiscal impact information might have made on their decision to support or reject Amendment No. 4. After describing the poll, this expert opined that a majority of voters likely would have rejected the amendment had they been told the measure would have a negative fiscal impact on the City. The state offered no evidence to rebut this opinion.

Neither contestant in *Dotson* and *Shoemyer* offered such evidence, and this Court emphasized there are no strict requirements regarding the kind of evidence a contestant must adduce to meet the burden of proof. *Dotson*, 464 S.W.3d at 195 (holding a contestant need not present evidence of particular voters who were misled). Each case must turn on its own facts.

A post-election contest based on a defect in the ballot title begins with a leg up in terms of showing the defect impacted the election. The ballot title is printed right on the ballot, and it is the last thing the voter sees before voting "yes" or "no." Chapter 116 controls the last thing the voters see and the most recent information the voters receive before casting their vote on proposed statutes and constitutional amendments. There

39

could have been many statements about ballot propositions the general assembly would have wanted to put before the voters immediately before they vote. But, with all those options to choose from, the general assembly chose two: (a) a short statement of what the proposal will do, and (b) a summary of the fiscal impact the proposal will have if adopted. The general assembly made this choice, presumably, because it believed these were the issues the voters would most want to see addressed – in writing – immediately before voting: (a) "What does this proposal do?" and (b) "If this proposal passes, what fiscal impact will it have?" The answers need not be perfect, but they cannot be wrong in any material respect, and they certainly cannot mislead the voters about either subject. For the state to decide what to put on the ballot and, as a result of that decision, to make the voter read information that is both materially inaccurate and seriously misleading is an "irregularity" of the highest conceivable magnitude.

So, not every ballot title that is insufficient or unfair for purposes of a pre-election challenge under section 116.190 will be an "irregularity" of such magnitude to justify a new election under section 115.593. But the ballot title in this case has a fiscal note summary that not only materially misstates the fiscal note, it is also seriously misleading as to the fiscal impact of the proposal identified in the fiscal note.[25] Given these defects,

_____

[25] This holding is supported by the opinion poll evidence and expert opinions offered by Lucas. Some of the state's criticisms concerning the limitations of this evidence have merit, and the state accurately emphasizes what this evidence does – and does not – say with precision and certainty. But, at a minimum, this evidence proves that words matter, and that a promise of free governmental services will poll better than services carrying a cost to be paid. As noted above, the Court might have inferred the material defects in the fiscal note summary cast doubt over the entire election simply from the size and nature of those defects and the fact they were the last information the voters saw before voting. The

40

and starting from the premise that the general assembly has determined this fiscal impact information is so important that it must be the last thing the voters see before voting, the Court holds this fiscal note summary was an "irregularity" of sufficient magnitude to cast doubt on the validity of the 2022 general election regarding Amendment No. 4. Under such circumstances, the only remedy the general assembly authorizes is a new election. § 115.593.[26]

**CONCLUSION**

For the reasons set forth above, the results of the 2022 general election approving Amendment No. 4 are set aside. This Court orders a special election for that question be conducted on August 6, 2024.[27] The secretary of state is ordered to take all actions

---

polling evidence offered by Lucas strengthens that inference. As a result, the Court need not determine how the case would have been decided without that evidence.

[26] Section 115.593 provides:

> If the court or legislative body trying a contested election determines there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election, it may ***order a new election*** … on the contested question. The order shall set the date of the election and shall be sent by the clerk of the court … to each election authority responsible for conducting the special election. In its order, the court or legislative body ***shall specify … the ballot title*** of the question to be voted on at the special election, and the election shall be conducted and the votes counted as in other elections. Notice of the election shall be given in such manner as the court … directs. The … question submitted at the special election shall be deemed approved if a majority of the votes at the special election are cast in favor of the question.

(Emphasis added).

[27] Section 115.593 provides, if this Court "determines there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election, it may order a new election … on the contested question." Nothing in this statute guides when such an election must take place. Article XII, section 2(b) of the Missouri Constitution provides:

41

necessary to effect this remedy, and notice of the special election is to be given as if the proposal were going before the voters for the first time.[28] The election shall be

---

"All [constitutional] amendments proposed by the general assembly or by the initiative shall be submitted to the electors for their approval or rejection by official ballot title as may be provided by law … at the next general election, or at a special election called by the governor prior thereto[.]" This language applies when the matter is first submitted to the voters, but it is unclear whether this language also limits the application of section 115.593 after a successful election contest. The Court, however, need not address this question in the present case.

[28] This Court's opinion was first handed down on April 30, 2024. The April 30 opinion was not final, however, because the mandate had not issued. Instead, like any opinion (unless otherwise noted), the April 30 opinion was subject to rehearing or modification on motion by any party, or on the Court's own motion. Unless the Court otherwise specifies, the mandate will not issue before all post-disposition motions pursuant to Rule 84.17(a) have been ruled upon or the time for filing such under Rule 84.17(b) has expired. On May 15, Lucas filed a motion under Rule 84.17(a)(2) asking this Court to modify language in the opinion, including in the new fiscal note summary. This motion extended the time during which the opinion was not final (and, therefore, subject to rehearing or modification) until this Court disposed of that motion. On May 28, while Lucas' motion remained pending, the governor issued a proclamation purporting to move the special election that this Court had not yet called from November 5 to August 6. On that same day, the secretary sent notices and related documents concerning that August 6 election to the local election authorities. On May 31, Lucas moved for a judgment of contempt against the secretary and injunctive relief ordering the secretary to comply with this Court's April 30 opinion. At the time of the governor's and secretary's actions, however, this Court had not ordered a special election for November 5 (or any other date) because no mandate had issued and the April 30 opinion was not final. Accordingly, Lucas' May 31 motion is denied as premature. In addition, Lucas' May 15 motion to modify is denied, but this Court hereby modifies this opinion on its own motion. As a matter of comity and to accommodate the governor's apparent desire to have the question decided on that date, one of those modifications is to change the date of the special election now called by this Court from November 5 to August 6, 2024. This modification leaves for another day the necessity to decide whether the governor has any authority, including any authority under article XII, section 2(b), of the Missouri Constitution, to move the date of a remedial "special election" ordered by this or any other court pursuant to section 115.593. See note 27, *supra*. No further motions under Rule 84.17 may be filed in this matter and the Clerk of the Court is instructed to issue the mandate (and distribute this Court's order as required under section 115.593) forthwith.

42

conducted and the votes counted as in other elections.  The special election for

Amendment No. 4 shall be conducted using the following ballot title:

**CONSTITUTIONAL AMENDMENT NO. 4[29]**
Proposed by the 101st General Assembly
(Second Regular Session)
SS2 SJR 38

　　　　Shall the Missouri Constitution be amended to authorize laws, passed before December 31st, 2026, that increase minimum funding for a police force established by a state board of police commissioners to ensure such police force has additional resources to serve its communities?

　　　　This would authorize a law passed in 2022 increasing required funding by the City of Kansas City for police department requests from 20% of general revenue to 25%, an increase of $38,743,646, though the City previously provided that level of funding voluntarily.  No other state or local governmental entities estimate costs or savings.


_____
　　Paul C. Wilson, Judge


Russell, C.J., Powell and Broniec, JJ., concur;
Gooch, J., concurs in part and dissents in part in separate opinion filed;
Fischer, J., concurs in separate opinion of Gooch, J.; and
Ransom, J., dissents in separate opinion filed.

---

[29]　The secretary of state is free to re-number Amendment No. 4 so as to avoid any duplication.  § 116.210.



**SUPREME COURT OF MISSOURI**
**en banc**

QUINTON LUCAS,                   )       *Opinion issued April 30, 2024*
                                     )

     Contestant,             )
                                     )

v.                            )       No. SC99931
                                     )

MISSOURI SECRETARY OF STATE   )
JOHN R. ASHCROFT AND         )
MISSOURI STATE AUDITOR       )
SCOTT FITZPATRICK,           )
                                     )

     Contestees.             )

**SEPARATE OPINION CONCURRING IN PART AND DISSENTING IN PART**

I concur in the principal opinion's analysis about why this Court has original jurisdiction in this election contest and is compelled by *stare decisis* to follow *Dotson v. Kander*, 464 S.W.3d 190, 193 n.2 (Mo. banc 2015), and *Shoemyer v. Missouri Secretary of State*, 464 S.W.3d 171, 173 n.2 (Mo. banc 2015). While the dissenting opinion's analysis is compelling, *Dotson* and *Shoemyer* are binding precedent on the issue of this Court's jurisdiction in an election contest like the one brought here. I agree with the principal opinion that this Court's precedent concluding this Court has original jurisdiction in an election contest related to a constitutional amendment may not be rejected under the high standard of "clearly erroneous and manifestly wrong." *Templemire v. W&M Welding, Inc.*, 433 S.W.3d 371, 379 (Mo. banc 2014).

I respectfully dissent as to the principal opinion's result.  I would deny relief to Lucas on the merits of his election contest for multiple reasons.  I would deny relief to Lucas because he did not comply with the plain language of section 115.557,[1] which provides:  "*Not later than thirty days after the official announcement of the election result* by the secretary of state, *any person … shall file a verified petition* in the office of the clerk of the supreme court."  (Emphasis added).  There is no dispute Lucas did not file a verified petition within 30 days of the announcement of the election result, as required by the plain language of section 115.557.  The secretary of state announced the certified election results on December 9, 2022; Lucas filed an *unverified* petition on January 6, 2023; and Lucas did not file a verified amended petition until January 26, 2023, more than 30 days after announcement of the election results.  This case involves sophisticated parties and counsel on all sides.  Lucas knew of section 115.557 as he cited it multiple times, along with other statutory sections, in his original unverified petition.  The analysis should end there.  Lucas did not satisfy the unambiguous requirements of section 115.557 as specified by the General Assembly and has no right to relief.[2]

---

[1] All statutory citations are to RSMo 2016, and all rule references are to Missouri Court Rules (2022).

[2] As to the argument Lucas satisfied the verification requirement when he filed a verified amended petition more than 30 days after announcement of the election result, this argument is unavailing.  Time is of the essence in every election contest as evidenced by the deadlines the General Assembly set in chapter 115.  *See* secs. 115.559.1 (service within two days), 115.559.2 (petition must be sent to interested parties "[i]mmediately"), 115.559.3 (answer within 15 days after petition filing instead of within 30 days after service provided for other civil actions by Rule 55.25(a)).  This Court has held "[e]lection contest review procedures are exclusive and must be strictly followed as substantive law."  *Hockemeier v. Berra*, 641 S.W.2d 67, 69 (Mo. banc 1982); *see also Foster v.*

2

I also would deny Lucas relief because he did not meet his high burden in a post-election contest of showing the ballot title for Amendment No. 4 was insufficient and unfair and constituted an irregularity sufficient to cast doubt on the fairness of the election and the results it produced. As the principal opinion notes, the auditor has great discretion in deciding how to summarize the fiscal note given the 50-word limitation and the statutory requirement to use language "neither argumentative nor likely to create

_Evert_, 751 S.W.2d 42, 44 (Mo. banc 1988) (reciting the quoted language from _Hockemeier_ and noting, "This Court has said that election contest statutes are a code unto themselves"). To the extent Lucas relies on _Beatty v. Metropolitan St. Louis Sewer District_, 700 S.W.2d 831 (Mo. banc 1985), that reliance is misplaced. In _Beatty_, this Court opined, without explanation, that Rule 55.33(c) applied to the question of whether an amended petition changing the named contestee related back to the date of filing of the original petition and concluded the amended petition did not relate back. _Id._ at 838. _Beatty_ did not address whether Rule 55.33(c) applies to the issue here of whether the verification requirement can be satisfied by an amended petition filed outside the 30-day period, and this Court in _Foster_ quoted _Beatty_ for the proposition that "[i]t is only by the invention of a tortuous reading that the election contest statutes can be made to be confusing, indefinite or uncertain." _Foster_, 751 S.W.2d at 44 (quoting _Beatty_, 700 S.W.2d at 837). In the very next paragraph in _Foster_, this Court concluded: "To the extent that it relies on rules of procedure which normally control civil actions to address election contest issues, respondent's argument is flawed[.]" _Id._ (holding cases requiring personal service on the contestee as a basis for jurisdiction in election contests should no longer be followed). As this Court has recognized, election contests are different. While there may be justification in other cases for finding a statutory verification requirement or other verification requirement satisfied by an amended petition, that is not true here, in the context of chapter 115. Further, the contestees properly raised compliance with chapter 115 in their briefing after this Court's order overruling the motion to dismiss without explanation because that order was interlocutory in nature. The overruling "of a motion to dismiss is an interlocutory order and not a judgment on the merits." _McMahon v. Geldersma_, 317 S.W.3d 700, 705 (Mo. App. 2010). "An interlocutory order may be reconsidered, amended, reversed or vacated by the trial court at any time prior to final judgment being entered." _Id._ (internal quotation omitted).

3

prejudice either for or against the proposed measure." Sec. 116.175.3; *State ex rel. Fitz-James v. Bailey*, 670 S.W.3d 1, 9 n.6 (Mo. banc 2023).

I would better understand the principal opinion's position if the record evidence was that the City was funding at the time of the election and had funded in the past at 20 percent and Amendment No. 4 changed the funding percentage to 25 percent such that the simple mathematical calculation the City supplied to the auditor would be correct as to costs or savings related to Amendment No. 4. But the record evidence here, and the fundamental problem with Lucas's argument, is that the City funded at or above 25 percent at the time of the election and in the several years before the election, so the City's $38,743,646 figure is correct only if the City relies on sheer speculation that the City in the future would discontinue the 25 percent funding, potentially resulting in costs of up to $38,743,646 to the City. The principal opinion acknowledges this issue when it includes in its proposed ballot language the qualifying language "though the City previously provided that level of funding voluntarily," even though neither that qualifying language nor any other qualifying language appears in the fiscal note itself.[3]

---

[3] Lucas also acknowledges this issue when he suggests ballot language that the City "estimates that [Amendment No. 4] could increase the City's costs by up to $38.7 million," but this proposed language is not consistent with the fiscal note or the principal opinion's proposed language. Further, the fiscal note summary submitted to voters was not insufficient or unfair based on the City's alternative suggestion, included in the fiscal note, that Amendment No. 4 may not increase the City's costs at all because Amendment No. 4 could result in commensurate decreases to other services to offset additional police funding. Even if, as the principal opinion suggests, this *potential* offset should be viewed as a fiscal impact or cost, the offset alternative is inconsistent with the other cost information the City provided to the auditor. Simply put, based on all of the inconsistent information the City provided to the auditor, Lucas is unable to meet his high burden in his post-election ballot title contest.

4

Further, this proposed language is itself materially misleading because the qualifying language is confusing; the qualifying language suggests the City was not funding at or above 25 percent at the time of the election, which it was; and the proposed ballot language does not track the fiscal note's language of "could increase the city's mandatory funding for the police … by more than $38.7 million."[4]

It is not within this Court's province to try to resolve deficiencies in the information given by the City to the auditor. In these circumstances, Lucas has not established the ballot title for Amendment No. 4 was insufficient and unfair and constituted an irregularity sufficient to cast doubt on the fairness of the election and the results it produced.[5] The drastic remedy of a new election is unwarranted.

_____
Ginger K. Gooch, Judge

---

[4] In the information provided to the auditor, the City referred to the cost as an exact figure ($38,743,646) while inconsistently also characterizing Amendment No. 4's fiscal impact as "more than $38.7 million," which suggests an unspecified maximum amount in excess of $38.7 million.

[5] I also would find Lucas did not show "there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election[,]" sec. 115.593, by his public opinion researcher polling. I will not elaborate on this issue given I would never reach it based on my case disposition outlined in this opinion.



# SUPREME COURT OF MISSOURI
## en banc

QUINTON LUCAS,          )
          )
    Contestant,       )
          )
v.               )    No. SC99931
          )
MISSOURI SECRETARY OF STATE  )
JOHN R. ASHCROFT AND     )
MISSOURI STATE AUDITOR     )
SCOTT FITZPATRICK,      )
          )
    Contestees.       )

## DISSENTING OPINION

Because I disagree with the determination this Court possesses original jurisdiction to hear this election contest, I respectfully dissent. The principal opinion attempts to justify the summary conclusion from *Dotson v. Kander*, 464 S.W.3d 190, 193 n.2 (Mo. banc 2015), that this Court had original jurisdiction to hear election contests involving constitutional amendments. At a superficial level, the principal opinion's jurisdictional analysis is appealing. But to accept that analysis, one must ignore the plain text of article VII, section 5, the evolution of the constitutional provision, and caselaw. Pursuant to our constitution, this Court was never to hear, in the first instance, election contests other than those for public officers. I part from the principal opinion's creative reading of article VII,

section 5.  Given I believe this Court should not entertain the contest, I express no views about the remainder of the principal opinion.

## Analysis

This Court's jurisdiction is established by the Missouri Constitution.  The primary grant of this jurisdiction is found in article V, sections 3 and 4, although other provisions in the constitution grant this Court original jurisdiction in limited circumstances. *Greenbriar Hills Country Club v. Dir. of Revenue*, 2 S.W.3d 798, 799 & n.1 (Mo. banc 1999).  One of those provisions is found in article VII, the article of the constitution titled "Public Officers."  It states:

> Contested elections for governor, lieutenant governor and other executive state officers shall be had before the supreme court in the manner provided by law, and the court may appoint one or more commissioners to hear the testimony.  The trial and determination of contested elections of all other public officers in the state, shall be by courts of law, or by one or more of the judges thereof.  *The general assembly shall designate by general law the court or judge by whom the several classes of election contests shall be tried and regulate the manner of trial and all matters incident thereto*; but no law assigning jurisdiction or regulating its exercise shall apply to the contest of any election held before the law takes effect.

Mo. Const. art. VII, sec. 5 (emphasis added).[1]

From the emphasized phrase above, the principal opinion concludes this Court has jurisdiction to hear a contested election involving a constitutional amendment.  In *Dotson*, this Court held, for the first time, that the constitutional provision cited above permitted

---

[1] The principal opinion apparently emphasizes the importance of the label ascribed to this section, which includes the phrase "other election contests."  That label, however, is not contained in the actual text of the constitution.  It exists merely as a convenience to navigating the constitution and has no legal import.

the legislature to cause contests to the results of elections for constitutional amendments to be heard originally before this Court. 464 S.W.3d at 193 n.2. This determination was repeated in *Shoemyer v. Missouri Secretary of State*, 464 S.W.3d 171, 173 n.2 (Mo. banc 2015), a case handed down the same day as *Dotson*. As alluded to in the principal opinion, neither *Dotson* nor *Shoemyer* engaged in a meaningful analysis to support the conclusion that article VII, section 5 permits the legislature to enact section 115.555,[2] which purports to require this Court to hear "all contests to the results of elections on constitutional amendments."

The analytical gap in *Dotson* remains unbridged by the new analysis of the principal opinion. The principal opinion lacks a plausible explanation for why a constitutional article addressing public officers would encompass the separate subject matter of election contests *beyond* public officers. Article VII, titled "Public Officers," contains 14 brief provisions, all of which—logically—deal with public officers and no other subject matter. When the framers of the 1945 constitution revised the provision at issue, they placed it in article VII, addressing public officers, where it naturally belongs. The critical sentence in the provision is not found in article VIII, which pertains to suffrage and elections, nor is it found in article XII, dealing with amending the constitution.

The language of the constitutional provision begs the question of what is meant by the phrase "the several classes of election contests." "Words used in constitutional provisions must be viewed in context." *Collins & Assocs. Dietary Consultants, Inc. v. Lab.*

---

[2] All statutory references are to RSMo 2016, unless otherwise specified.

*& Indus. Rels. Comm'n,* 724 S.W.2d 243, 245 (Mo. banc 1987), *superseded on other grounds by* section 476.410, RSMo 1994. To understand the import of the phrase "the several classes of election contests," it must be considered in the context of the overall provision, which pertains to public officers. The first sentence of the section clearly gives this Court authority to hear contested elections for executive state officers and explains how that is to occur, i.e., "in the manner provided by law." The next sentence addresses contests for "all other public officers in the state" and specifies where this should occur in general, i.e., "by courts of law, or by one or more of the judges thereof." In specifying those election contests should occur in courts, the directive does not specify how those contests should be conducted, unlike the first sentence, which established the contests would be regulated "in the manner provided by law." *How* election contests should be conducted for non-executive public officers in the state is set forth in the third sentence: the legislature is able to specify the court and the manner of the contest. The phrase "the several classes of election contests" refers to the different possible classes "of all other public officers in the state." The framers recognized the legislature would be able to address contests for those non-executive state officers by dealing with similar public officers together. "[T]he several classes of election contests" refers to this legislative grouping—no more, no less. Article VII, section 5 simply does not address election contests beyond those for public officers.

This interpretation is supported by the text of the constitutional provision as it existed in the Missouri Constitution of 1875 and caselaw interpreting that provision. The prior version of the constitutional provision stated:

4

> The trial and determination of contested elections of all public officers, *whether State, judicial, municipal or local*, except Governor and Lieutenant Governor, shall be by the courts of law, or by one or more of the judges thereof. The General Assembly shall, by general law, designate the court or judge by whom *the several classes of election contests* shall be tried, and regulate the manner of trial and all manners incident thereto; but no such law, assigning jurisdiction or regulating its exercise, shall apply to any contest arising out of any election held before said law shall take effect.

Mo. Const. art. VIII, sec. 9 (1875).[3] By its plain language, "the several classes of election contests" inherently referred to the different classes of public officers: state, judicial, municipal, or local. This constitutional provision served "to insure [sic] the trial of contested elections *of all public offices*, with the exception of Governor and Lieutenant

---

[3] The debates of the Missouri Constitutional Convention of 1875 reveal the provision was borrowed from the recently enacted Pennsylvania Constitution. *See* 4 Debates of the Missouri Constitution of 1875 at 434 (The State Hist. Soc'y of Mo. 1938). That constitution provided:

> The trial and determination of contested elections of electors of President and Vice-President, members of the General Assembly, and of all public officers, whether State, judicial, municipal or local, shall be by the courts of law, or by one or more of the law judges thereof; the General Assembly shall, by general law, designate the courts and judges by whom the several classes of election contests shall be tried, and regulate the manner of trial and all matters incident thereto; but no such law assigning jurisdiction, or regulating its exercise, shall apply to any contest arising out of an election held before its passage.

Pa. Const. art. VIII, sec. 17 (1874). Obviously, this provision was concerned only with elections of individuals. In *Wilson v. Blaine*, the Supreme Court of Pennsylvania noted:

> By various provisions in the Constitution of this state *the elections of public officials are provided for*, and, by article 8, § 17, *the different classes thereof are stated*, and *as to them* it is directed that——
>> 'The General Assembly shall, by general law, designate the courts and judges by whom the several classes of election contests shall be tried, and regulate the manner of trial and all matters incident thereto.'

105 A. 555, 556 (Pa. 1918) (emphasis added).

5

Governor, in the courts of law." *State ex rel. Wells v. Hough*, 91 S.W. 905, 912 (Mo. banc 1906) (emphasis added); *see also Bradbury v. Wightman*, 134 S.W. 511, 511 (Mo. banc 1911) (noting the constitutional provision "undertakes to do two things: [f]irst, it takes from the Senate the power to hear and determine contested elections *of all public officers*, whether state, judicial, municipal, or local, except Governor and Lieutenant Governor; and, second, to confer that power and jurisdiction upon courts of law, or in one or more of the judges thereof, as the Legislature may designate by general law" (emphasis added)).[4]

This dissenting opinion is not the first to read the provision in this manner. Judge Graves, in two dissenting opinions, maintained the "classes" in the constitutional provision referred to the different classes of public officers earlier listed in the provision. *State ex rel. Rainwater v. Ross*, 149 S.W. 451, 454 (Mo. banc 1912) (Graves, J., dissenting) (finding "section 9 of article 8 of the Constitution only speaks of contests for office, and not of contests of elections upon public questions"); *Bradbury*, 134 S.W. at 512 (Graves, J., dissenting) ("This constitutional provision, so far as contests before the courts are concerned, divides the officers into three general classes, i.e.: (1) 'State'; (2) 'judicial'; and

---

[4] The 1875 constitution contemplated a variety of elections beyond elections for office. *See, e.g.*, Mo. Const. art. IX, sec. 2 (1875) (to remove county seats); *id.* art. IX, sec. 8 (for township organization); *id.* art. IX, sec. 16 (to approve charters); *id.* art. X, sec. 12 (to approve municipal indebtedness); *id.* art. XV, sec. 2 (to approve constitutional amendments proposed by the general assembly). The results of all such elections *could* have been challenged if authorized by the legislature. *See, e.g.*, *State ex rel. Ellis v. Elkin*, 30 S.W. 333, 337 (Mo. 1895) (finding Missouri had no express provisions of law for contests of elections for the removal of county seats). Subject to constitutional limitations, those challenges could have occurred in whatever manner the legislature deemed appropriate. But electing officers was viewed differently. The purpose of adding section 9 to the constitution was to remove politics from the selection of public officers. *See Wells*, 91 S.W. at 912.

6

(3) 'municipal or local.'"). The principal opinion in each case did not attempt to counter this reasoning, likely because such an obvious proposition did not need to be addressed. Rather, in *Bradbury*, the principal opinion found the legislature had not enacted a statute regarding the specific office at issue. 134 S.W. at 512. In *Rainwater*, the principal opinion permitted a contest to an election under the local option law to borrow procedure from the existing law dealing with the election of county officers in the state. 149 S.W. at 452-53.

*State ex rel. McDonald v. Lollis*, 33 S.W.2d 98 (Mo. banc 1930), provides further support that the constitutional provision has never authorized courts to hear election contests beyond those regarding public officers. In *McDonald*, this Court was presented with the issue of whether a statute permitting "[c]ircuit courts and the judges thereof in vacation" to hear and determine primary contests was valid. *Id.* at 99. In an attempt to suggest a contest under the statute was proper, the constitutional provision was cited. *Id.* at 100. This Court dismissed the argument, noting:

> It is true the amendment[5] provides that the judge of a court of law may hear and determine contested elections *of all public officers*, but this provision furnishes no reason for holding that a judge in vacation may hear and determine a contested nomination for a public office. *The express language of the amendment limits the authority of the judge of a court to the hearing and determination of contested elections of public officers*, thereby excluding the idea that the framers of this amendment intended to vest such judge with authority to hear and determine contested nominations for a public office. A primary election for the purpose of nominating candidates for public offices is not the election of public officers; therefore, constitutional authority to the judge of a court to hear and determine contested elections of public officers does not give him authority to hear and determine contested nominations for public offices.

---

[5] By amendment in 1924, the relevant provision was moved to article VIII, section 8.

7

*Id.* (emphasis added).  As demonstrated by this passage, the scope of the constitutional provision is limited to election contests for public officers.

The legislature's authority to direct where election contests could be heard perhaps became muddled by caselaw permitting election-contest statutes to borrow procedure from existing statutes.  Missouri's local option law, enacted in the 1880s, contained a provision permitting elections under it to "be contested in the same manner as is now provided by law for the contest of the elections of county officers." *Rainwater*, 149 S.W. at 452.  This Court held such procedural adoption was proper.  *Id.* at 453.  In the exercise of the power granted by the constitutional provision, statutes were enacted "prescribing a complete remedy *for the contest of an election to office* by a private citizen."  *Id.* (emphasis added).  From those statutes, it was proper for "the Legislature [to] adopt[] another statute or mode of procedure by reference."  *Id.*  Notably, in adopting the procedure provided for contests to the elections of county officers, the contest to the election under the local option law was being heard in a circuit court.  Section 5924, RSMo 1909 ("The several circuit courts shall have jurisdiction in cases of contested elections for county and municipal offices ….").

Such adoption of procedure was discussed again in *State ex rel. City of Monett v. Thurman*, 187 S.W. 1190 (Mo. banc 1916).  In another contest in the local option law context, a party alleged the statute, which permitted the election to be contested in the same manner as provided by law for the contest of the election of county officers, conflicted with the constitutional provision at issue.  *Id.* at 1192; section 7242, RSMo 1909.  This Court disagreed, stating:

8

The General Assembly long ago passed the general law intended by this [constitutional provision], and [the statute] adopts its provisions as to jurisdiction and procedure in local option contests. The section of the Constitution set out does not restrict contests to elections of officers. As to such contests it provides the sole method and excludes other methods, but we find no authority for the conclusion that a constitutional direction with reference to procedure as to a particular and specified matter precludes all legislative action upon another and different matter.

*Thurman*, 187 S.W. at 1192 (citation omitted). Two key propositions can be taken from this analysis. First, the constitutional provision is specific to public officers. Second, the legislature is free to pass laws regarding other election contests.[6] No authority exists, however, for the legislature to cause those contests to be heard, in the first instance, before this Court, which has its original jurisdiction clearly limited in the Missouri Constitution.

In spite of this Court's limited jurisdiction specified in the constitution, the legislature passed the following law in April 1917:

The result of any election or vote upon a proposed constitutional amendment … may be contested upon the petition of one or more qualified voters of the state directed against the secretary of state. The provisions of law governing contested elections for the officers mentioned in section 5951 Revised Statutes of Missouri for the year 1909 shall govern the contests herein

---

[6] The principal opinion's analysis is critically flawed in this respect, and its reference to *Rainwater* wholly misses the point of that case. The general assembly is free to legislate on the topic of a contested election for a proposed constitutional amendment. "[T]he legislative power of Missouri's General Assembly, under Article III, Section 1 of the Missouri Constitution, is plenary, unless, of course, it is limited by some other provision of the constitution." *Bd. of Educ. of City of St. Louis v. City of St. Louis*, 879 S.W.2d 530, 533 (Mo. banc 1994). Unless prohibited by the federal or state constitution, "the legislature has the power to enact any law." *Three Rivers Junior Coll. Dist. of Poplar Bluff v. Statler*, 421 S.W.2d 235, 238 (Mo. banc 1967). While article VII, section 5 provides constraints regarding election contests *for public officers*, it does not impact potential legislation for other election contests. The general assembly lacks authority, however, to cause this Court—outside of its appellate jurisdiction—to hear contests involving proposed constitutional amendments.

9

provided for, the petitioning voter or voters to be considered as the party contestant and the secretary of state as the contestee.

1917 Laws of Mo. 274.  The statute referenced in the new law commanded this Court to hear and determine "contested elections for judge of the supreme court, judge of the St. Louis and Kansas City courts of appeals, superintendent of public schools, secretary of state, state auditor, state treasurer, and attorney-general."  Section 5951, RSMo 1909.  Article VIII, section 9 of the 1875 constitution authorized the legislature to cause election contests for these public officers to be heard in this Court.  No constitutional authority, however, permitted the election contest contemplated by the 1917 law to be heard in this Court.  The same is true of its modern counterpart, section 115.555, as to any contest beyond the election for the public officers listed.

Unfortunately, *Dotson* and *Shoemyer* simultaneously found this Court to have original jurisdiction to hear election contests for constitutional amendments.  Both cases did so on the basis of article VII, section 5 and *Gantt v. Brown*, 149 S.W. 644 (Mo. banc 1912).  *Dotson*, 464 S.W.3d at 193 n.2; *Shoemyer*, 464 S.W.3d at 173 n.2.  As discussed, the constitutional provision does not support this Court's jurisdiction in the matter.  *Gantt*, likewise, does not support this Court's jurisdiction.[7]  In *Gantt*, the Court was confronted with the question of whether it had jurisdiction to entertain a contest for the office of judge of this Court.  149 S.W. at 645.  Article VIII, section 9 of the 1875 constitution gave the

---

[7] One "important factor in determining whether a precedent should be overruled is the quality of its reasoning." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 917 (2018).  Here, very little deference should be owed to a holding premised on a bare reference to an irrelevant constitutional provision and a case that had nothing to do with the proposition for which it was cited.

10

trial and determination of contested elections of judicial officers to the courts of law. *Id.* By statute, contested elections at the time for judges of the Court were to be heard by this Court. *Id.* The contestees in *Gantt,* however, nevertheless argued the Court was given purely appellate jurisdiction by the constitution, except in the case of certain writs. *Id.* at 646. The Court, in plain adherence to the constitution, disagreed. *Id.* (noting article VI, section 2 of the 1875 constitution gave the Court appellate jurisdiction only, "except in cases otherwise directed by this Constitution"). Because article VIII, section 9 of the 1875 constitution conferred original jurisdiction, the Court had jurisdiction to hear the case. *Id.* Nothing in *Gantt* would suggest the Court should have original jurisdiction in contests beyond public officers.

Of note, *Gantt* was written by Judge Graves, who, as discussed above, made clear his opinion of the meaning of the constitutional provision. *Dotson*'s reliance on *Gantt* makes no sense, and it ignores the *relevant* viewpoint of the opinion's author. In *Gantt*, the Court recognized the constitutional provision granted it "the right to hear and determine such election contest cases *as we have before us now*." 149 S.W. at 646 (emphasis added). Before the Court was a contest to an election for a judge of this Court—a public officer. *Id.* at 645. The Court was not discussing "election contests" in a broad sense to cover election contests beyond public officers.[8]

---

[8] The principal opinion plainly misconstrues Judge Graves' holding in *Gantt*. In a case involving an election contest for a public officer, Judge Graves' use of the phrase "any class of election contest cases" would still fully adhere to his prior viewpoint on the subject.

11

Although the contestant relied on *Dotson* and *Shoemyer* to bring this contest before this Court, the finding of jurisdiction in those cases was erroneous. This Court's jurisdiction is both created and confined by the Missouri Constitution. The legislature is without authority to enact laws, no matter how beneficial, expanding this Court's original jurisdiction beyond that specified in the constitution.[9] This Court should respect the boundaries of its jurisdiction with great caution.

The doctrine of *stare decisis* should not bind this Court's hands in considering its own jurisdiction, which springs from a single source: the state's constitution. Following *Dotson*'s holding without further inquiry is not warranted. "The doctrine of *stare decisis* promotes security in the law by encouraging adherence to previously decided cases." *Indep.-Nat'l. Educ. Ass'n v. Indep. Sch. Dist.*, 223 S.W.3d 131, 137 (Mo. banc 2007). But the doctrine "is not absolute". *Id. Dotson*'s unsupported reliance on article VII, section 5 to find jurisdiction was error. As explained in this dissenting opinion, that section is inapplicable.

An incorrect interpretation of the state's constitution should not be followed simply to uphold an erroneous opinion. *Id.* ("Deviations from clear constitutional commands— although longstanding—do not promote respect for the rule of law."); *see also Med. Shoppe Int'l, Inc. v. Dir. of Revenue*, 156 S.W.3d 333, 335 n.5 (Mo. banc 2005) (noting "[j]udicial

---

[9] As an example, this Court, by order, has declined to answer certified questions despite statutory authority to do so. *Grantham v. Mo. Dep't of Corr.*, No. SC72576, 1990 WL 602159, at *1 (Mo. banc July 13, 1990) (noting the constitutional provisions establishing and limiting this Court's general jurisdiction "do not expressly or by implication grant the Supreme Court of Missouri original jurisdiction to render opinions on questions of law certified by federal courts").

re-interpretation is particularly apt with respect to constitutional principles"). It was for this reason that a majority of this Court had no qualms about overruling precedent in *Independence-National Education Association* when that precedent contradicted the plain meaning of a constitutional provision. 223 S.W.3d at 137. The same should be true now.

## Conclusion

Because I believe this Court is without jurisdiction to originally hear this contest, I respectfully dissent.

_____
Robin Ransom, Judge